Jaques v. Commercial Travelers.

No. 22,034.

JENNIE L. JAQUES, *Appellee*, v. THE ORDER OF UNITED COM-
MERCIAL TRAVELERS OF AMERICA, *Appellant.*

SYLLABUS BY THE COURT.

1. ACCIDENT INSURANCE—*Commercial Traveler—Change of Occupation—
Question of Fact for Jury.* A person whose regular vocation for thirty
years was that of a commercial traveler, and who, when his usual
business was dull or when he desired to be at home for a short time to
enjoy the society of his family, was accustomed for short intervals to
do any sort of labor obtainable near home, does not thereby, as a mat-
ter of law, change his occupation within the fair interpretation of an
ordinary accident insurance policy.

2. SAME—*Change of Occupation.* Ordinarily, a person does not change
his occupation within the meaning of an ordinary policy of accident
insurance without both acts and intention showing a purpose so to do.

3. SAME—*Change of Vocation—Question for Jury.* The facts touching
the acceptance of temporary work as a janitor by an insured person
who was a commercial traveler, in order to be at home with his family
for a short time, but who had also avowed his purpose not to continue
at such work, but to go back to his own vocation, examined, and held
to present a fair question of fact for the jury, as to whether the in-
sured had changed his vocation—following *Evans v. Accident Associa-
tion,* 102 Kan. 556, 171 Pac. 643.

4. SAME—*Cause of Death—Question of Fact for Jury.* The evidence
touching the question whether the insured died of violent, external,
and accidental means, or whether he died of disease, examined, and
*held* to be a question of fact for the jury; and *held,* also, that the evi-
dence sufficiently supported the verdict.

5. SAME—*Exclusion of Evidence.* The exclusion of a certified copy of the
death certificate authorized by section 10167 of the General Statutes
of 1915, although it was admissible, in this case was not prejudicial
error.

6. SAME—*Instructions.* It is immaterial that there may be inaccuracy in
an instruction on a phase of a lawsuit upon which the judgment is not
based.

7. SAME. It is not error to refuse an instruction on an issue raised by
the pleadings but abandoned for want of proof, or otherwise waived at
the trial.

8. SAME—*Change of Occupation—Acts and Statements of Insured Com-
petent Evidence.* In an action to recover on an accident insurance
policy, where one defense thereto was that the insured had changed
his occupation without notifying the insurer, as the policy required,
the pertinent acts and conduct of the deceased policyholder, including

what he said—his pertinent verbal conduct—as well as what he did, prior to his fatal accident, touching his purposes and intentions, are competent items of evidence to determine the controverted question of fact.

Appeal from Wyandotte district court, division No. 1; ED-WARD L. FISCHER, judge. Opinion filed April 12, 1919. Affirmed.

*C. A. Miller,* of Kansas City, *Charles M. Howell, Joseph S. Brooks,* both of Kansas City, Mo., and *John A. Millener,* of Columbus, Ohio, for the appellant.

*E. E. Martin,* of Kansas City, and *Alfred Jaques,* of St. Paul, Minn., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This lawsuit was brought to recover on a policy of accident insurance.

The defendant issued a policy of insurance to the late William F. Jaques, a commercial traveler, which provided that if Jaques should die of violent, external, and accidental means the defendant would pay the plaintiff, wife of Jaques, the sum of $6,300.

Plaintiff's petition alleged that her husband died of injuries sustained by falling downstairs in his home in Kansas City. Defendant denied liability, alleging that Jaques died of disease, and not from accidental injuries; that the terms of the policy provided that if Jaques should change his occupation without notifying defendant the rights conferred by the policy should be forfeited, and that Jaques did, without notifying the defendant, change his occupation to that of a janitor in the schools of Kansas City; and that the policy also provided that if Jaques should change his occupation to that of a janitor, (and notify the defendant of the fact,) the defendant's liability in the event of his accidental death would be limited to half the sum for which a traveling salesman's life was insured under similar conditions. The application of Jaques for insurance, the policy, the by-laws of the defendant, and other pertinent and related matters were fully pleaded.

Upon a verdict of the jury in plaintiff's favor, the trial court entered judgment.

Defendant assigns various errors, one of which is involved in the question whether the insured changed his occupation. On this subject, the evidence disclosed that, except for brief intervals, Jaques had followed the occupation of a commercial traveler for nearly thirty years; that in 1903, when he was a traveling salesman of harvesting machinery, and aged 48 years, the policy sued on was issued to him; that he usually followed such occupation; that for short intervals, when business was dull or when he desired to enjoy the society of his family for a short time, he was accustomed to take any sort of employment that he could get at or near home; that once, for a short time, he had served as secretary of the Kansas City Mercantile Club; that in the summer of 1916, when Jaques was 61 years old, he called on a member of the Kansas City board of education and asked him for a place in the employment of the school board for a little while, saying that he would like to work around home for a while; and that pursuant to such request Jaques was placed on the pay roll of the board of education as a "janitor" or "extra janitor," and as such employee of the board did janitor work when some regular janitor was off duty, and worked in the school board's storeroom, checked incoming and outgoing school supplies, did clerical work, and delivered school supplies at the various schoolhouses of the city. He did this sort of work for almost two months, from September 1 until October 28, when he met with the accident, in his own home, in the early morning, while coming downstairs. His appointment as janitor would ordinarily endure for a school year of nine months; but no contract was made between the school board and the deceased, and he was privileged to quit working for the school board when he might choose to do so; and in a conversation with a fellow employee—a shop foreman—of the school board, Jaques stated:

"I do not intend to stay here, just a chance to stay home and get acquainted with my family life; you know that sixty dollars a month is not very much. I make more than that on the road; I am going to stay a while and get acquainted with my family."

In view of such evidence as above recited, can it be said that there was error in submitting to the jury the question whether the deceased had changed his occupation? Under our own precedents, and well-considered decisions from other juris-

dictions, it seems not.  Ordinarily a person does not change his occupation within the meaning of an ordinary policy of accident insurance without both *acts* and *intention* showing a purpose so to do.  In *Evans v. Accident Association,* 102 Kan. 556, 171 Pac. 643, it was held that an insured, who was a schoolteacher and superintendent of schools and listed as such in his accident policy, could not be held to have definitely and permanently changed his occupation, merely because, after his school term had expired in the month of May, he had worked on a farm during the summer, and during the autumn had made an unsuccessful electioneering campaign for the office of county treasurer, and was accidentally killed on his farm while chopping down a tree during the following December, some seven months after the termination of his last employment at his regular occupation.  It will be observed that in that case, the work which the insured was doing at the time of his death—cutting down a tree—was much more hazardous than that of his regular occupation as a schoolmaster.

The amount of insurance paid for accidents is logically and reasonably based upon the relation of the employment to the hazards involved in that employment.  Surely the rates exacted and the insurance to be paid are not based upon mere caprice.  In the case at bar, the employment of the deceased, whether at his regular occupation as drummer or at his temporary work as janitor, had not the slightest relation to his accident.  The accident did not flow from his employment.  He fell while descending the stairway in his own home, which adventure involved the same identical hazard whatever occupation he might be pursuing to earn his bread outside that home.

Looking into some of the many cases cited in the L. R. A. note referred to in the Evans case (24 L. R. A., n. s., 1174), we find that the supreme court of Nebraska held that the change of occupation referred to in the policy meant the substitution of one business or vocation for the other as the usual business or vocation of the assured, and did not refer to a casual or incidental resort to other activities for thirty days, where the vocation described in the policy was not abandoned, and it was undisputed that the assured expected within a few days to continue his usual vocation.  (*Taylor v. Illinois Commercial Men's Ass'n,* 84 Neb. 799.)

It has been held that a traveling salesman who was out of employment for two years and residing meanwhile on his father's farm had not changed his occupation (*Simmons v. Western Travelers Accident Ass'n*, 79 Neb. 20). A teacher out of employment who was injured while building houses was held not to have changed his occupation (*Stone's Adm'rs v. United States Casualty Co.*, 34 N. J. L. 371). Where an auctioneer had gone on a distant journey to buy horses, it was held no change in occupation (*Star Accident Co. v. Sibley*, 57 Ill. App. 315).

Under the facts of this case, and the foregoing precedents, the court holds that it was for the jury to determine whether the deceased had definitely changed his occupation, or had merely taken up temporary work near his home to enjoy and cultivate the society of his family for a short time, but with no intention of abandoning his life work as a commercial traveler, and the jury's verdict on that question cannot be disturbed.

It was stoutly contended in the trial court, and is still insisted on here, that the evidence disclosed that William F. Jaques died of disease, and not of injuries sustained through violent, external, and accidental causes. The man fell headlong down a flight of stairs. He was 61 years old. He was badly hurt about the head, and elsewhere. He complained particularly about the numbness of the right side of his head. A corresponding paralysis soon afterwards attacked the left side of his body. His death occurred in a month after his fall. In view of these facts, it is not a startling conclusion that the jury should determine that the violent, external, accidental fall down the stairway of his home caused the death of this old man. Of course, there was an autopsy, and the surgical experts, or most of them, swore that he died because the central cerebral artery had hardened and thrombosis had set in; that the lumen of that artery had clogged; that consequently that portion of the brain fed by that artery had deteriorated and had ceased to function; and that this disease or sequence of diseases, and not the headlong fall downstairs, had caused his death. Not all the expert evidence was to that effect, however. One expert was of opinion that the fall might have partly caused the maladies of the central cerebral artery and brain tissues. Be that as it may, although expert opinion evidence coming from deservedly reputable and disinterested

anatomists and physicians must be conscientiously considered and weighed by the jury, such evidence cannot be judicially held to annihilate the simple, concrete evidence of other facts and circumstances which tended so strongly to show that Jaques' death was caused by his falling down the stairway. The credence and weight to be given to expert and opinion evidence was for the jury's determination (*Baird v. Shaffer,* 101 Kan. 585, 590, 168 Pac. 836), and the finding of the jury on this controverted issue of fact must stand. (*Wideman v. Faivre,* 100 Kan. 102, 106, 163 Pac. 619; *Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.)

It is also contended that the court erred in excluding from the evidence defendant's proffer of a certified copy of the death certificate of Jaques. Defendant cites section 10167 of the General Statutes of 1915 to justify its admission. The court's ruling was based on the fact that the physician who prepared that certificate was a local resident of Kansas City, who could be subpœnaed if his testimony was desired; and it cannot be said that the ruling of the court was prejudicial. While the death certificate was competent under the statute, its legal sanction goes no further than to assure its evidential status where it may be inconvenient or impossible to procure the best evidence, that is, the certifying physician's oral testimony. Moreover, the certificate, aside from its narrative of facts not in dispute, recited that the cause of Jaques' death was "Cerebral Edema," duration, "4 days"; secondary contributory cause, "Atheromatous arteries," duration, "—— days." This evidence, even considered most favorably for defendant, would only have been cumulative, and but indifferently at that, to other expert testimony orally given and dogmatically maintained by defendant's witnesses.

Complaint is made of an instruction which dealt with the amount of recovery—one-half the face of the policy if Jaques had changed his occupation to that of a janitor;—but this instruction needs no consideration, since if he so changed his occupation in this case there could be no recovery of any amount, because Jaques failed to notify the defendant. In this case, the recovery must be all or nothing.

The court refused defendant's request for an instruction touching the nonliability of defendant if an autopsy was held without defendant's request, and without notice to it. Such an

issue was raised by the pleadings, but there was no proof of irregularity in this respect in the holding of the autopsy. Defendant's witnesses were present at the autopsy, and the defense was chiefly maintained on what was disclosed in the autopsical investigation. Plaintiff made no use of the facts discovered by the autopsy, in her evidence in chief. No error is discerned in the court's refusal to give the instruction requested.

A final contention is urged against the admissibility of the evidence touching statements made by Jaques when he solicited employment by a member of the board of education, and concerning what he said to his fellow workman touching his purpose in seeking and accepting temporary work so that he could be at home with his family for a little while. Jaques' acts and conduct—what he said and did—were compentent to prove the critical and controlling fact of this case—whether or not he had changed his occupation. It would offend justice to determine this matter without giving proper consideration to his intentions also. Indeed, his statements were a pertinent part of his conduct through which the controlling fact was to be determined. Without the aid of Jaques' verbal acts, his other conduct would be so equivocal that a jury could not say with certainty whether Jaques had determined to change his occupation or not. The simpler aspects of the verbal-conduct rule are more familiar in criminal cases, perhaps, than in civil actions, but the principle justifying their admissibility is the same. (See 3 Wigmore on Evidence, §§ 1772, 1774, and in same volume, "Verbal Acts," etc., p. 2274 *et seq.*)

No prejudicial error which would justify the interference of an appellate court is disclosed in this record, and the judgment is therefore affirmed.